[778 NYS2d 171]

Cᴇᴍ Uᴢᴀɴ et al., Respondents, v 845 UN Lɪᴍɪᴛᴇᴅ Pᴀʀᴛɴᴇʀꜱʜɪᴘ, Appellant, et al., Defendant.

First Department, June 15, 2004

**APPEARANCES OF COUNSEL**

*Kramer Levin Naftalis & Frankel LLP*, New York City (*Charlotte Moses Fischman* and *Dan A. Rosenbaum* of counsel), and *Jay Goldberg P.C.*, New York City, for appellant.

*Marcus Rosenberg & Diamond LLP*, New York City (*David Rosenberg* of counsel), for respondents.

*Herrick, Feinstein LLP*, New York City (*Scott E. Mollen* of counsel), for Real Estate Board of New York, Inc., amicus curiae.

## OPINION OF THE COURT

MAZZARELLI, J.

This appeal presents the issue of whether plaintiffs, who defaulted on the purchase of four luxury condominium units, have forfeited their 25% down payments as a matter of law. Because the governing purchase agreements were a product of lengthy negotiation between parties of equal bargaining power, all represented by counsel, there was no evidence of overreaching, and upon consideration of the fact that a 25% down payment is common usage in the new construction luxury condominium market in New York City, we hold that upon their default and failure to cure, plaintiffs forfeited all rights to their deposits pursuant to the rule set forth in *Maxton Bldrs., Inc. v Lo Galbo* (68 NY2d 373 [1986]).

*Facts*

In October 1998, defendant 845 UN Limited Partnership (sponsor or 845 UN) began to sell apartments at the Trump World Tower (Trump World), a luxury condominium building to be constructed at 845 United Nations Plaza. Donald Trump is the managing general partner of the sponsor. Plaintiffs Cem Uzan and Hakan Uzan, two brothers, are Turkish billionaires[1] who sought to purchase multiple units in the building.

In April 1999, plaintiffs and an associate executed seven purchase agreements for apartments in Trump World. Only four of those units (the penthouse units) are the subject of this lawsuit and appeal. As relevant, Cem Uzan defaulted on contracts to buy two penthouse units on the 90th floor of the

---

1. In an unrelated action, plaintiffs were found to have defrauded Motorola, Inc. out of approximately $1 billion in connection with a deal to develop a cellular telephone network in Turkey (*see Motorola Credit Corp. v Uzan*, 274 F Supp 2d 481, 490-492 [SD NY 2003]). Plaintiffs are subject to various orders in the federal action restraining their assets, and they are subject to arrest if they attempt to enter the United States (*id.*).

building, and Hakan defaulted on contracts to purchase two other penthouse units on the 89th floor.[2]

The building had not been constructed when plaintiffs executed their purchase agreements. In paragraph 17.4 of those contracts, the sponsor projected that the first closing in the building would occur on or about April 1, 2001, nearly two years after the signing of the agreements.

The condominium offering plan included a section titled "Special Risks to be Considered by Purchasers," which stated:

> "Purchasers will be required to make a down payment upon execution of a Purchase Agreement in an amount equal to 10% of the purchase price, and within 180 days after receipt of the executed Purchase Agreement from Sponsor or 15 days after Purchaser receives a written notice or amendment to the Plan declaring the Plan effective, whichever is earlier, an additional down payment equal to 15% of the purchase price . . . ."

Once construction was completed, the building's offering plan was amended to require a 15% down payment. Notably, both the original and the amended offering plans prominently disclosed the sponsor's right to retain the *entire down payment* should there be an uncured default.

*Negotiations Preceding Execution of the Purchase Agreements*

Plaintiffs were represented by experienced local counsel during the two-month-long negotiation for the purchase of the apartments. There were numerous telephone conversations between counsel, and at least four extensively marked-up copies of draft purchase agreements were exchanged. In consideration for plaintiffs' purchase of multiple units, the sponsor reduced the aggregate purchase price of the penthouse units by more than $7 million from the list price in the offering plan for a total cost of approximately $32 million. Plaintiffs also negotiated a number of revisions to the standard purchase agreement, including extensions of time for payment of the down payment. As amended, each purchase agreement obligated plaintiffs to make a 25% down payment: 10% at contract, an additional $7^{1}/_{2}\%$ down payment 12 months later, and a final $7^{1}/_{2}\%$ down payment 18 months after the execution of the contract. At no time did

---

**2.** The transactions for three of the seven total units closed in July of 2001. Antonio Betancourt, an associate of the Uzans, purchased two units on the 59th floor of the building, and plaintiff Cem Uzan purchased a unit on the 80th floor.

plaintiffs object to the total amount required as a nonrefundable down payment.

There were other significant amendments to the standard purchase agreement which benefitted plaintiffs. These included: (1) rights to terminate the contracts if the closing had not occurred by December 31, 2003; (2) rights to advertise the units for resale prior to closing; (3) conditional rights to assign the purchase agreements to a third party; and (4) the right of each brother to terminate his contracts if the sponsor terminated the purchase agreements for the other brother's units. It is noted that according to counsel for the sponsor, the right to assign the purchase contracts prior to closing had not been granted to any other purchaser of a unit at Trump World. Also, at plaintiffs' urging, the sponsor added language to the purchase agreements agreeing not to install machinery on the roof that would cause noise or vibration in the apartments.

The executed purchase agreements provide, at paragraph 12 (b), that:

> "[u]pon the occurrence of an Event of Default . . . [i]f Sponsor elects to cancel . . . [and i]f the default is not cured within . . . thirty (30) days, then this Agreement shall be deemed canceled, and Sponsor shall have the right to retain, as and for liquidated damages, the Down payment and any interest earned on the Down payment."

Plaintiffs paid the first 10% down payment installment for the penthouse units on April 26, 1999 when they signed the purchase agreements. They paid the second 7$\frac{1}{2}$% installment in April 2000, and the third 7$\frac{1}{2}$% installment in October 2000. The total 25% down payment of approximately $8 million was placed in an escrow account.

*Default, Failure to Cure, and this Action*

On September 11, 2001, terrorists attacked New York City by flying two planes into the World Trade Center, the City's two tallest buildings, murdering thousands of people. Plaintiffs, asserting concerns of future terrorist attacks, failed to appear at the October 19, 2001 closing, resulting in their default. By letter dated October 19, 2001, plaintiffs' counsel stated:

> "[W]e believe that our clients are entitled to rescind their Purchase Agreements in view of the terrorist attack which occurred on September 11 and has not abated. In particular, our clients are concerned that

> the top floors in a 'trophy' building, described as the tallest residential building in the world, will be an attractive terrorist target. The situation is further aggravated by the fact that the building bears the name of Donald Trump, perhaps the most widely known symbol of American capitalism. Finally, the United Nations complex brings even more attention to this location."

That day 845 UN sent plaintiffs default letters, notifying them that they had 30 days to cure. On November 19, 2001, upon expiration of the cure period, the sponsor terminated the four purchase agreements.

Plaintiffs then brought this action. They alleged that Donald Trump had prior special knowledge that certain tall buildings, such as Trump World, were potential targets for terrorists. Plaintiffs also alleged that Trump World did not have adequate protection for the residents of the upper floors of the building. In their first cause of action, plaintiffs averred that the sponsor's failure to advise prospective purchasers of the specific risks of a terrorist attack on Trump World, and to amend the offering plan to describe these risks, constituted common-law fraud and deceptive sales practices pursuant to General Business Law § 352. Plaintiffs' second claim is that the same acts constituted violations of General Business Law §§ 349 and 350. The third cause of action sought a declaratory judgment that the down payment was an "unconscionable, illegal and unenforceable penalty." The IAS court dismissed plaintiffs' first two claims in a March 2002 order not on appeal.

*Motions for Summary Judgment*

After exchanging discovery and conducting various depositions, plaintiffs moved for summary judgment on their third cause of action, arguing that forfeiture of the down payments was an unenforceable penalty. In support of their motion, plaintiffs submitted an attorney's affirmation to which were annexed: the pleadings, correspondence between counsel, the IAS court's order denying dismissal of the declaratory judgment cause of action, and certain news articles and promotional materials about the Trump World Tower.

Defendant opposed the motion and cross-moved for summary judgment, asserting that defaulting vendees on real estate contracts may not recover their down payments. Defendant submitted the affidavits of Donald Trump, Leonard Ritz, Esq. and Ian Silver, Esq., two associates at the sponsor's law firm,

Marilyn Weitzman, president of a nationwide real estate consulting firm headquartered in New York City, and Michael Martin, a consultant to the Trump Corporation.

Defendant also included the offering plan, the purchase agreements, Cem Uzan's 2000 purchase agreement for an apartment at 515 Park Avenue (with a 25% down payment provision), various correspondence between the parties, excerpts from the deposition testimony of Hakan Uzan, Jeffrey M. Diamond and Donald Trump, studies regarding the Manhattan real estate market, and an estimation of the sponsor's damages as of March 31, 2003. Defendant's submissions contain substantial evidence of the common usage of a 20% to 25% down payment in the preconstruction luxury condominium market.

*The Role of the 25% Down Payment*

In his affidavit in support of the cross motion, Donald Trump stated that he sought 25% down payments from preconstruction purchasers at the Trump World Tower because of the substantial length of time between contract signing and closing, during which period the sponsor had to keep the units off the market, and because of the obvious associated risks. Trump also affirmed that down payments in the range of 20% to 25% are standard practice in the new construction luxury condominium submarket in New York City. He cited three projects where he was the developer, the Trump Palace, 610 Park Avenue and Trump International Hotel and Tower, all of which had similar down payment provisions. Trump also noted that,

> "[i]n new construction condominium projects, purchasers often speculate on the market by putting down initial down payments of 10% and 15% and watching how the market moves. If the market value increases, they will then make the second down payment. If the market prices drop, they may then walk away from their down payment."

Weitzman's affirmation echoed Trump's opinion that 20% to 25% down payments are customary in New York City for new construction condominium apartments, because of the volatility of the market. Weitzman also discussed other risk factors specific to developers of newly constructed luxury condominium projects. She concluded that from the sponsor's perspective, future competition is largely unknown, requiring an educated guess by the developer of the appropriate level of services and amenities to be provided at the building. Weitzman also noted that the demographic profile for potential purchasers in the lux-

ury condominium submarket includes many foreign nationals, who are inherently high risk purchasers because their incomes and assets are often difficult to measure, and to reach. Both Weitzman and Martin stated, based upon research detailed in their affidavits, that the volatility of individual real estate transactions increases with the size of the unit involved, and that price swings for three- and four-bedroom units, such as the penthouse units plaintiffs sought to purchase here, were greater than for smaller apartments.

Defendant also presented a compilation of 16 recent condominium offering plans, all of which required down payments of either 20% or 25% of the purchase price for the unit. Fourteen of the 16 offering plans required 25% down payments. Further, defendant provided proof that in July 2001, plaintiff Cem Uzan closed on the purchase of an apartment on the 80th floor of Trump World after making a 25% down payment, and that he had previously purchased another apartment at 515 Park Avenue, also with a 25% down payment provision.

*The Order Appealed*

After hearing oral argument on the motion, the IAS court granted defendant partial summary judgment, finding that plaintiffs forfeited the portion of their down payment amounting to 10% of the purchase price, pursuant to *Maxton Bldrs., Inc. v Lo Galbo* (68 NY2d 373 [1986], *supra*). The court held that the remainder of the down payment was subject to a liquidated damages analysis to determine whether it bore a reasonable relation to the sponsor's actual or probable loss. Defendant appeals from that portion of the order which denied it full relief.

*Discussion*

More than a century ago, the Court of Appeals, in *Lawrence v Miller* (86 NY 131 [1881]), held that a vendee who defaults on a real estate contract without lawful excuse cannot recover his or her down payment. It reaffirmed this holding in *Maxton (supra)*, again in 1986. The facts of *Lawrence* are common to real estate transactions, and parallel those presented here. In that case, plaintiff made a $2,000 down payment on the purchase of certain real estate, and then defaulted. The seller refused to extend plaintiff's time to perform the contract, retained the down payment, and ultimately sold the property to another purchaser. In plaintiff's subsequent action for a refund of the down payment, the Court of Appeals affirmed a judgment dismissing the complaint, stating:

"To allow a recovery of this money would be to

sustain an action by a party on his own breach of his own contract, which the law does not allow. When we once declare in this case that the vendor has done all that the law asked of him, we also declare that the vendee has not so done on his part. And then to maintain this action would be to declare that a party may violate his agreement, and make an infraction of it by himself a cause of action. That would be ill doctrine." (*Lawrence*, 86 NY 131, 140 [1881].)

For over a century, courts have consistently upheld what was called the *Lawrence* rule and recognized a distinction between real estate deposits and general liquidated damages clauses.[3] Liquidated damages clauses have traditionally been subject to judicial oversight to confirm that the stipulated damages bear a reasonable proportion to the probable loss caused by the breach. By contrast, real estate down payments have been subject to limited supervision. They have only been refunded upon a showing of disparity of bargaining power between the parties, duress, fraud, illegality or mutual mistake (*see Cipriano v Glen Cove Lodge #1458*, 1 NY3d 53 [2003]).

In *Maxton*, plaintiff had contracted to sell defendants a house, and accepted a check for a 10% down payment. When defendants canceled the contract and placed a stop payment on the check, plaintiff sued for the down payment, citing the *Lawrence* rule. Defendants argued that plaintiff's recovery should be limited to its actual damages. In ruling for the vendor, the Court of Appeals identified two legal principles as flowing from *Lawrence*. First, that the vendor was entitled to retain the down payment in a real estate contract, without reference to his actual damages. Second, the "parent" rule, upon which the first rule was based, that one who breaches a contract may not recover the value of his part performance.

The Court noted that the parent rule had been substantially undermined in the 100 years since *Lawrence*. Many courts had rejected the parent rule because of criticism that it produced a forfeiture "and the amount of the forfeiture increases as performance proceeds, so that the penalty grows larger as the breach grows smaller" (*Maxton*, 68 NY2d 373, 379 [1986] [citation omitted]).

---

**3.** A liquidated damage clause is a contractual provision by which the parties stipulate to a fixed sum to be paid in the event of a breach.

The Court also noted that since *Lawrence*, the rule of allowing recovery of down payments of not more than 10% in real estate contracts continues to be followed by a "majority of jurisdictions," including in New York (*Maxton*, 68 NY2d at 380). Thereafter, the Court noted the long and widespread reliance on the *Lawrence* rule in real estate transactions, and it concluded that, based upon notions of efficiency and avoiding unnecessary litigation, the rule should remain in effect (*id.* at 381).

After acknowledging that "real estate contracts are probably the best examples of arm's length transactions," the Court broadly concluded:

> "Except in cases where there is a real risk of overreaching, there should be no need for the courts to relieve the parties of the consequences of their contract. *If the parties are dissatisfied with the rule of [Lawrence], the time to say so is at the bargaining table.*" (*Maxton*, 68 NY2d 373, 382 [1986] [emphasis supplied].)

The *Maxton/Lawrence* rule has since been followed by this Court as well as the other departments to deny a refund of a down payment when a default has occurred (*see Chateau D'If Corp. v City of New York*, 219 AD2d 205 [1996], *lv denied* 88 NY2d 811 [1st Dept 1996]; *Armas v Yuska*, 2 AD3d 660 [2d Dept 2003]; *Gallant v Staten Is. Sav. Bank*, 266 AD2d 340 [2d Dept 1999], *lv denied* 95 NY2d 751 [2000]; *Zahl v Greenfield*, 162 AD2d 449 [2d Dept 1990], *lv denied* 76 NY2d 709 [1990]; *Barton v Lerman*, 233 AD2d 555 [3d Dept 1996]; *Badame v Bock Enters. Inc.*, 190 AD2d 1066 [4th Dept 1993]).

Further, other departments have specifically applied the *Maxton/Lawrence* rule, where, as here, a real estate down payment of greater than 10% of the purchase price is at issue (*see Collar City Partnership I v Redemption Church*, 235 AD2d 665 [3d Dept 1997], *lv denied* 90 NY2d 803 [1997] [50% down payment]; *Vitolo v O'Connor*, 223 AD2d 762 [3d Dept 1996] [23% down payment]; *Badame v Bock Enters. Inc.*, 190 AD2d 1066 [4th Dept 1993], *supra* [more than 10% down payment]).

In the *Collar City* case (*supra*), the Third Department upheld the forfeiture, on default, of payments approximating 50% of the purchase price for certain real estate. Here, plaintiffs and the IAS court try to distinguish that case by asserting that the holding there was based on the fact that plaintiff's payments were made in consideration for extensions of time to perform the contract. The Third Department did not rest its holding on that fact; rather it wrote:

"defendant is entitled to retain *all* monies it received from plaintiff, *whether viewed as consideration for the extensions of time granted by defendant to complete performance of the contract [citations omitted] or additional deposits made on the contract, as a matter of law (see, Maxton Bldrs. v Lo Galbo, supra; Lawrence v Miller, supra)."* (*Collar City*, 235 AD2d 665, 666 [1997], *supra* [emphasis supplied].)

Earlier, in the *Vitolo* case, the Third Department had also applied the *Lawrence/Maxton* rule and refused to return a 23% down payment made for the purchase of a single-family home. The Court noted there that while application of the *Maxton/Lawrence* rule might seem severe,

"the parties to th[e] transaction were dealing at arm's length. Plaintiffs were aware that they were making a sizeable down payment; any negotiating over the amount . . . should have been done at the time of the agreement." (*Vitolo, supra* at 764-765.)

A 1996 case from this department, *Chateau D'If* (*supra*) is also instructive. In that case, the City attempted to sell property at a public auction. The contract contained a provision allowing the City to retain the down payment in the event of the buyer's default, and, in addition, to sue for damages should the down payment be insufficient to compensate it for its losses. The IAS court found the provision unenforceable, and ordered the return of the down payment to the defaulting purchaser. This Court reversed.

After an extensive discussion of the *Maxton/Lawrence* rule, the law as applied to liquidated damages clauses was also reviewed and the Court concluded that while:

"[t]he function of a liquidated damages clause is to resolve the damage question without further dispute by setting an arbitrary approximation of damages . . . . *It does not follow, though, that if the liquidated damages clause is unenforceable the down payment must be returned.*" (219 AD2d at 209.)

Significantly, in its holding the Court in *Chateau D'If* also recognized the unique nature of a real estate down payment and the vitality of the *Maxton/Lawrence* rule.

Applying the reasoning of these cases to the facts of the instant matter, it is clear that plaintiffs are not entitled to a return of any portion of their down payment. Here the 25%

down payment was a specifically negotiated element of the contracts. There is no question that this was an arm's length transaction. The parties were sophisticated businesspeople, represented by counsel, who spent two months at the bargaining table before executing the amended purchase agreements.

Further, the record evidences that it is customary in the preconstruction luxury condominium industry for parties to price the risk of default at 25% of the purchase price. The purchase agreements included a detailed nonrefundable down payment clause to which plaintiffs' counsel had negotiated a specific amendment. That amendment allowed for the payment of 25% of the purchase price in three installments: 10% at contract, an additional 7¹/₂% 12 months later, and a final 7¹/₂% 18 months later. Clearly, plaintiffs were fully aware of and accepted the requirement of a nonrefundable 25% down payment for these luxury preconstruction condominiums. In fact, Cem Uzan has purchased two other condominiums, one in the same building, with similar down payment provisions.

Plaintiffs negotiated the payment of the 25% down payments in installments to spread their risk over time (*see Peartree Assoc., LLC v Naclerio*, 303 AD2d 210 [2003]). In the event of a severe economic downturn, plaintiffs were free to cancel the deal, capping their losses at the amount paid as of the date of their default. For the sponsor, the 25% deposit served to cover its risk for keeping the apartments off the market should the purchaser default.

Finally, there was no evidence of a disparity of bargaining power, or of duress, fraud, illegality or mutual mistake by the parties in drafting the down payment clause of the purchase agreements. The detailed provision concerning the nonrefundable deposit was integral to the transaction. If plaintiffs were dissatisfied with the 25% nonrefundable down payment provision in the purchase agreements, the time to have voiced objection was at the bargaining table (*see Maxton*, 68 NY2d 373, 382 [1986], *supra*). Because they chose to accept it, they are committed to its terms. Thus, upon plaintiffs' default and failure to cure, defendant was entitled to retain the full 25% down payments.

Accordingly, the order of the Supreme Court, New York County (Alice Schlesinger, J.), entered July 21, 2003, which, to the extent appealed from, denied defendant 845 UN Limited Partnership's motion for summary judgment, should be reversed, on the law, with costs, defendant's motion granted and

the complaint dismissed. The Clerk is directed to enter judgment in favor of defendant-appellant dismissing the complaint as against it.

NARDELLI, J.P., LERNER and FRIEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered July 21, 2003, reversed, on the law, with costs, defendant-appellant 845 UN Limited Partnership's motion for summary judgment granted and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendant-appellant dismissing the complaint as against it.