(April 29, 2010)

■ DIPLOMAT PROPERTIES, L.P., Respondent, v KOMAR FIVE ASSOCIATES, LLC, Appellant, et al., Defendant. [899 NYS2d 237]—

Orders, Supreme Court, New York County (Herman Cahn, J.), entered August 6, 2008, December 12, 2008, and February 27, 2009, which, respectively, granted plaintiff's motion to dismiss defendant Komar Five Associates, LLC's affirmative defenses and counterclaims; to the extent appealed from as limited by the brief, denied defendant's motion for renewal; and granted plaintiff's motion for summary judgment declaring that it was entitled to retain defendant's contract deposit and denied defendant's cross motion for summary judgment dismissing the complaint, unanimously affirmed, with costs.

On May 3, 2007, plaintiff and defendant Komar Five Associates, LLC executed an agreement for the purchase and sale of the Diplomat Hotel and Convention Center and related facilities in Hollywood and Hallandale Beach, Florida, for $690 million. Upon execution of the purchase and sale agreement (the contract), defendant delivered a $20 million deposit to defendant escrow agent, First American Title Insurance Company. The contract provided that the closing would occur on August 1, 2007, but that upon notice from defendant and an additional $10 million deposit, defendant purchaser had the right to extend the closing date for up to 60 days.

Defendant subsequently requested an extension of the closing date. In connection therewith, the parties executed a first amendment to the contract, dated July 26, 2007, in which defendant acknowledged that (1) its due diligence period had ended on June 4, 2007; (2) it had had a sufficient opportunity to conduct due diligence and waived any objections it had raised or could have raised under section 6.12;[1] (3) it would not terminate the contract under section 6.12 and, therefore, would not be entitled to a return of the deposit under section 6.12; (4) it was satisfied with and accepted the property; and (5) it was proceeding with the purchase of the property in its "as-is, where-is" state and condition, subject to the terms and conditions set forth in the contract. Defendant agreed to waive, release, rescind and terminate any and all allegations, assertions, claims and demands that it was not afforded sufficient access to and/or

---

1. Section 6.12 sets forth a limited right to terminate during the due diligence period if, as a result of defendant's due diligence investigation, it was determined in accordance with the contract procedures that a "Major Property Condition" existed.

did not receive adequate information to conduct its due diligence investigations of the property. A new closing date was set for October 31, 2007.

As the closing approached, plaintiff asserts that it contacted defendant numerous times to prepare for the closing. Plaintiff received no response. Defendant concedes that it did not respond, but maintained that no response was required since plaintiff was in breach of the contract.

By letter dated October 30, 2007, defendant informed plaintiff that it would not appear on the scheduled closing date "because of the numerous breaches of [plaintiff] under the [contract]," including an agreement plaintiff allegedly had entered into with the City of Hallandale specifying that future development of the property be phased-in over a 10-year period, in violation of section 3.8 of the contract.[2] Defendant stated that it still desired to acquire the property, but demanded an "abatement and an offset from the purchase price equal to the damages sustained by [it]." The letter concluded, "In the event that you do not immediately notify us of your acknowledgment of your obligation to grant such an abatement, and the adjournment of the closing until such abatement is agreed upon, we shall pursue all of our rights to enforce the Agreement and the law of the State of New York and acquire title to the Property pursuant to the Agreement with an abatement and offset as permitted pursuant to the law of the State of New York."

On October 31, 2007, plaintiff appeared at the closing, ready, willing and able to close. Defendant failed to appear and failed to wire the balance of the purchase price to plaintiff, and plaintiff commenced this action on or about the same date.

Defendant purchaser is bound by the exclusive remedy provisions set forth in the parties' contract, having failed to adduce any facts from which a trier of fact could find that plaintiff seller engaged in misconduct "smack[ing] of intentional wrongdoing" (*Banc of Am. Sec. LLC v Solow Bldg. Co. II, L.L.C.*, 47 AD3d 239, 244 [2007] [internal quotation marks and citation omitted]). The City of Hallandale confirmed twice that,

---

2. Section 3.8 (a) provides that except as set forth on an annexed schedule, "there are no management, service, supply, or maintenance or other contracts or agreements that are Material Agreements in effect with respect to the Property other than the Operating Agreements, the Occupancy Agreements, and agreements disclosed in the Title Commitment." "Material Agreement" is defined as any contract or agreement if the aggregate amount payable during any calendar year equaled or exceeded $100,000, or the term of such contract expired after the first anniversary of the closing date, provided that no such contract was deemed "material" if terminable on 60 days' or fewer days' notice.

notwithstanding any discussions that may have taken place as to the way the development of the property that was the subject of the contract might proceed, there was no actual or proposed agreement concerning any development restriction between the City or its agencies and plaintiff, at any time preceding defendant's default under the contract. Thus, there was no breach of plaintiff's obligation, pursuant to section 3.8 (a) of the contract, to disclose the existence of a "Material Agreement[ ]." Further, due diligence materials furnished to defendant referred to development of the property as proceeding in "phases." This $690 million project was not scheduled to be completed and ready for occupancy until 2017. As defendant, in the first amendment to the contract, expressly warranted that it had had a sufficient opportunity to conduct due diligence and that it waived any objections it had raised or could have raised, it will not now be heard to complain.

Similarly unavailing is defendant's argument that plaintiff misrepresented its ability to obtain the necessary approvals for the addition of 1,388 residential units on the golf course and that this constitutes a "material deviation" from the predevelopment work described in section 6.6 of the contract. We note first that, as the motion court pointed out, section 6.6 defines the predevelopment work in terms of an "approximately 349 unit hotel" and "a mix of uses at the existing golf course," and the number 1,388 does not appear there or anywhere else in the contract. In any event, defendant did not identify this alleged "breach" in the October 30, 2007 letter that it asserts constituted the requisite notice and demand to cure under section 9.1 of the contract. Defendant raised the argument for the first time in February 2008, long after the closing. Moreover, plaintiff sought approval from the City, but there was no guarantee that it would receive it. Indeed, witnesses testified that a land use planning amendment (LUPA) was only a partial, first-level entitlement, and that without City approval of the LUPA, the zoning, the site plan, and the design, "you've got nothing." Finally, since, as the record shows, it was not until November 2007, i.e., after the scheduled closing date, that plaintiff learned that the City was considering approving 900 rather than 1,388 units, the alleged "breach" cannot constitute a lawful excuse for defendant's failure to close.

Defendant argues that its request for specific performance should have been construed as a demand for the return of its deposit under section 9.1 (a) of the contract. However, its October 30, 2007 letter did not comply with the requirements of section 9.1 (b). That section provides that in the event plaintiff

failed to comply with its closing obligations as set forth in section 7.2 or 7.4, defendant could seek performance if certain conditions were met. Defendant, which did not appear at the closing, did not allege any breach of plaintiff's closing obligations under section 7.2 or section 7.4. It alleged a violation of section 3.8 (a) and other provisions. Thus, it was not entitled to seek specific performance under section 9.1 (b).

The breach of fiduciary duty and tortious interference counterclaims were insufficiently pleaded (*see SNS Bank v Citibank*, 7 AD3d 352, 354 [2004]; *V. Ponte & Sons v American Fibers Intl.*, 222 AD2d 271, 272 [1995]), as was the counterclaim for tortious interference with prospective business relations (*see Snyder v Sony Music Entertainment*, 252 AD2d 294, 299-300 [1999]).

None of the new "evidence" proffered by defendant in support of its motion to renew established that plaintiff acted in bad faith or that it breached the contract by entering into an agreement with the City to restrict development of the property or by misrepresenting the number of residential units to be built on the golf course.

As plaintiff established that it was ready, willing and able to close on the closing date, and defendant failed to demonstrate a lawful excuse for its failure to close, plaintiff was entitled to retain the contract deposit (*Rivera v Konkol*, 48 AD3d 347 [2008]). Defendant's argument that plaintiff improperly terminated the contract by instituting this action on October 31, 2007 is without merit. Concur—Mazzarelli, J.P., Sweeny, Catterson, Acosta and Abdus-Salaam, JJ.