[952 NYS2d 137]

DONERAIL CORPORATION N.V., Respondent, v 405 PARK LLC, Appellant.

405 PARK LLC, Appellant, v DONERAIL CORPORATION N.V. et al., Respondents.

First Department, October 9, 2012

## APPEARANCES OF COUNSEL

*Meister Seelig & Fein, LLP*, New York City (*Stephen B. Meister, Kevin Fritz* and *Remy J. Stocks* of counsel), for appellant.

*Kelly Drye & Warren, LLP*, New York City (*Michael C. Lynch, William C. Heck* and *Joel A. Hankin* of counsel), for respondents.

## OPINION OF THE COURT

RICHTER, J.

In this failed real estate transaction, we are asked to decide whether the seller, Donerail Corporation N.V., is entitled to retain the earnest money deposit paid by the purchaser, 405 Park LLC, pursuant to a contract for sale of an office building in New York City. When the time-of-the-essence closing failed to occur, 405 Park initiated an action against Donerail seeking return of the deposit, alleging that Donerail had breached the parties' contract by failing to tender an unencumbered title at closing. Donerail brought a separate action, asserting that it was entitled to retain the deposit because 405 Park had breached the agreement by failing to pay the balance of the purchase price. Because Donerail demonstrated that it was ready, willing and able to close the transaction, and 405 Park refused to close, we conclude that Donerail is entitled to retain the deposit.

On June 11, 2007, Donerail and 405 Park entered into a Purchase and Sale Agreement (the agreement) whereby Donerail agreed to sell, and 405 Park agreed to buy, a 17-story office building located at 405 Park Avenue in Manhattan. The purchase price was $178,500,000, and in accord with the agreement, 405 Park wired an earnest money deposit of $38,550,000 to Donerail's escrow agent. Several months later, the parties entered into a Second Amendment to the agreement (the amendment) pursuant to which the earnest money deposit was released from escrow and delivered to an intermediary of Donerail, and $600,678.58 in accrued interest on the deposit,

denominated "Pre-Effective Date Interest," was paid to 405 Park.

Pursuant to section 6.1 of the agreement, if 405 Park failed to complete the purchase for reasons other than Donerail's default, Donerail's sole remedy was to terminate the agreement and receive the earnest money, along with interest, as liquidated damages for the breach. The amendment further provided that if 405 Park defaulted in its obligation to close, 405 Park was required to pay Donerail the $600,678.58 in Pre-Effective Date Interest it had received. On the other hand, if the closing did not occur for reasons other than 405 Park's default, then the earnest money deposit, along with certain other sums, was to be refunded by Donerail to 405 Park.

Although the closing date was initially scheduled for January 15, 2008, the parties agreed to a number of extensions, and a final closing date was set for June 29, 2009. During the two-year period between the contract date and the closing date, there was a sharp decline in the market value of office buildings in Manhattan. At a December 10, 2008 meeting, Avi Banyasz, a representative of 405 Park, told David E. Barry, Donerail's president, that because of the decline in the market value of the property, 405 Park could not complete the purchase for the $178,500,000 contract price.

According to Donerail, if 405 Park were to purchase the property, it would stand to lose upwards of $90,000,000. On the other hand, if 405 Park were to break the contract, its liability would be much lower—the amount of the earnest money deposit, $38,500,000, plus the $600,678.58 in accrued interest. Thus, Donerail maintains that the drop in real estate values made it more financially advantageous for 405 Park to simply walk away from the deal rather than complete the purchase. 405 Park's inclination not to close is evident from a May 27, 2009 email between two of its investors. In that email, the investors discussed a plan to "attend the closing and try for a defective tender and then sue on that basis." Even on appeal, 405 Park concedes that the real estate market had declined and that its preference was not to close.

At the time the agreement was entered into, the property was encumbered by an existing mortgage in the amount of approximately $25,000,000. The mortgage loan contained terms which were very favorable to Donerail at that time—it was interest-only until the maturity date and bore an interest rate of 5.03%. Although the promissory note secured by the mortgage

did not allow for prepayment, Donerail could obtain a satisfaction of the mortgage by a process defined in the note as "defeasance." Specifically, Donerail could purchase defeasance collateral in the form of securities, chosen by the mortgage lender, which would be used to pay the remaining amounts due under the loan. Thus, the securities would, in effect, be substituted as collateral for the loan, and the property would be released from the mortgage lien.

By letter dated May 15, 2009, Donerail declared that time was of the essence with respect to 405 Park's obligation to close on June 29, 2009, and stated that if 405 Park failed to perform its obligations under the agreement on that date, it would be in default. On June 23, 2009, Donerail sent 405 Park a draft closing statement detailing the disbursement of the funds to be provided to Donerail by 405 Park at closing. This schedule included a disbursement by 405 Park of $28,500,000 to pay the lender of the existing mortgage; 405 Park did not object to the closing statement. On June 24, 2009, the mortgage lender's counsel delivered to Fidelity, the title company identified in the agreement, an executed satisfaction of mortgage releasing the property from the existing mortgage. Lender's counsel instructed Fidelity to hold the satisfaction in escrow and not record the document until Fidelity received further instructions from counsel with respect to the defeasance transaction.

On June 29, 2009, the day of closing, Donerail authorized Commercial Defeasance, LLC to purchase the defeasance securities that had been designated by the mortgage lender. Commercial Defeasance purchased the securities, on Donerail's credit, at a cost of approximately $27.7 million. This figure represented a premium of about $2.7 million over the $25 million principal amount of the loan because the securities would cover not just the principal but also future interest payments. As a result, Donerail owed Commercial Defeasance $27.7 million, which Donerail was prepared to pay at the closing. The defeasance transaction would take two days, and was scheduled to be complete on June 30, 2009, the day after the closing, after which the satisfaction of mortgage would be filed.

At the closing, Donerail announced that it was ready to close, and that the mortgage satisfaction was being held in escrow by Fidelity. Fidelity's title closer, who was present at the closing, confirmed that Fidelity was in possession of the satisfaction, and stated that the defeasance transaction was a two-day process. 405 Park expressed its full understanding of the defeasance

process, and stated it was ready to pay the remainder of the purchase price, but objected to the use of its funds to pay for the securities.[1] In response, Donerail told 405 Park that it was prepared to use its own funds to pay for the securities without using any portion of 405 Park's monies, provided that 405 Park concurrently pay the remainder of the purchase price.[2]

Donerail also told 405 Park that Fidelity was prepared to issue an owner's title insurance policy without exception for the mortgage upon 405 Park's payment of the remaining purchase price. Still, 405 Park refused to consummate the transaction. To address 405 Park's concerns, Donerail offered to allow 405 Park to retain, from the balance of the purchase price, $50 million—twice the amount of the mortgage—until the defeasance process was complete, and the mortgage was removed of record. Once again, 405 refused to close, insisting that the defeasance process had to be complete, and the existing mortgage discharged, before it would pay the balance of the purchase price. The closing ended without the transaction being completed.

The next day, June 30, 2009, Donerail sent a letter to 405 Park terminating the agreement, stating that it intended to retain the earnest money deposit as a result of 405 Park's breach, and demanding return of the $600,678.58 interest. That same day, Donerail sold the securities it had purchased and suffered a loss of approximately $400,000; Donerail also claims it spent about $400,000 in closing expenses. By letter dated July 1, 2009, 405 Park demanded return of the deposit, asserting that Donerail breached the agreement due to its purportedly nonconforming tender of title. Donerail declined to return the deposit.

Donerail brought an action against 405 Park asserting a cause of action for breach of contract and seeking return of the $600,678.58 in interest 405 Park had previously received (*Donerail Corp. N.V. v 405 Park LLC*, Sup Ct, NY County, index No.

---

**1.** 405 Park took this position despite the fact that it is accepted practice in real estate transactions to use the purchaser's moneys to pay off existing mortgages. Furthermore, 405 Park had made no previous objection to the draft closing statement which made clear that the mortgage would be paid off from the sale proceeds.
**2.** Donerail was able to pay this amount with funds in its bank accounts and through a $10 million line of credit Donerail obtained, for this very purpose, on the closing date.

602108/09).[3] 405 Park commenced its own action against Donerail asserting three breach of contract claims and a claim seeking imposition of a contract vendee's lien against the property.[4] 405 Park sought return of the earnest money, along with interest, and foreclosure of the lien (*405 Park LLC v Donerail Corp. N.V.*, Sup Ct, NY County, index No. 602187/09). Donerail interposed counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and specific performance. The two actions were subsequently consolidated.

405 Park moved for summary judgment on its first cause of action for breach of contract and fourth cause of action for foreclosure of the lien, and sought dismissal of Donerail's complaint and counterclaims. Donerail cross moved for summary judgment on its claims and counterclaims, and for dismissal of 405 Park's complaint. In an order entered February 8, 2011, the motion court denied both parties' motions (30 Misc 3d 1221[A], 2011 NY Slip Op 50147[U] [2011]). Each of the parties sought reargument and renewal, and 405 Park moved to compel discovery. In an order entered September 27, 2011, the court denied 405 Park's motions in their entirety and denied Donerail's reargument motion, but granted Donerail's motion to renew (2011 NY Slip Op 33622[U] [2011]). Upon renewal, the court dismissed 405 Park's complaint, granted summary judgment to Donerail on its breach of contract cause of action, and referred the matter to a referee to hear and report on the amount of interest to which Donerail is entitled. 405 Park now appeals from both orders.

It is well-settled that absent a breach on the part of the seller, a purchaser who defaults on a real estate contract without lawful excuse cannot recover its down payment (*see Lawrence v Miller*, 86 NY 131, 139-140 [1881]; *Rivera v Konkol*, 48 AD3d 347, 348 [1st Dept 2008]; *Uzan v 845 UN Ltd. Partnership*, 10 AD3d 230, 236 [1st Dept 2004]). Furthermore, when a party to a real estate contract declares time to be of the essence in setting a closing date, each party must tender performance on that date, and a failure to perform constitutes a default (*see Grace v Nappa*, 46 NY2d 560, 565 [1979]; *115-117 Nassau St., LLC v*

---

**3.** Donerail's complaint also included a cause of action alleging breach of the implied covenant of good faith and fair dealing and seeking $800,000 in damages.

**4.** 405 Park also named Two Riverway Holdings LLC as a defendant, asserting a cause of action seeking to impose a constructive trust on property owned by Two Riverway that was allegedly purchased with a portion of the earnest money deposit released from escrow.

*Nassau Beekman, LLC*, 74 AD3d 537, 537 [1st Dept 2010]). Thus, where a seller seeks to hold a purchaser in breach of contract, the seller must establish that it was ready, willing, and able to perform on the time-of-the-essence closing date, and that the purchaser failed to demonstrate a lawful excuse for its failure to close (*see Diplomat Props., L.P. v Komar Five Assoc., LLC*, 72 AD3d 596, 600 [1st Dept 2010], *lv denied* 15 NY3d 706 [2010]; *Atlantic Dev. Group, LLC v 296 E. 149th St., LLC*, 70 AD3d 528, 529 [1st Dept 2010]; *Pinhas v Comperchio*, 50 AD3d 1117 [2d Dept 2008]).

▮ Applying these principles, we conclude that the motion court properly dismissed 405 Park's complaint and granted summary judgment to Donerail on its breach of contract claim. First, there is no question that Donerail declared time to be of the essence with respect to the June 29, 2009 closing date. Donerail's May 15, 2009 letter clearly and unequivocally stated so, and further warned that 405 Park would be in default if it failed to perform its obligations on the closing date (*see 2626 Bway LLC v Broadway Metro Assoc., LP*, 85 AD3d 456, 457 [1st Dept 2011] ["seller's unilateral scheduling of a clear and unequivocal 'time of the essence' closing date on three-weeks' written notice was reasonable under the circumstances"]).

Nor is there any doubt that 405 Park failed to perform its contractual obligations at the closing. Section 4.3 (a) of the parties' agreement states, in pertinent part, that "[a]t the closing, [405 Park] shall . . . pay to [Donerail] the Purchase Price . . . in immediately available wire transferred funds." Despite being told, numerous times, that Donerail was ready to complete the transaction, 405 Park repeatedly refused to pay the balance of the purchase price. Because 405 Park failed to tender performance on the time-of-the-essence closing date, it was in default (*see Rivera v Konkol*, 48 AD3d at 348 [purchaser's default in failing to deliver balance of the purchase price entitled sellers to retain down payment]).

Contrary to 405 Park's assertion, the record shows that Donerail was fully prepared to tender performance in compliance with the parties' agreement. Section 4.2 (a) required Donerail to deliver to 405 Park at closing a "bargain and sale deed without covenants against grantor's acts (the 'Deed'), in recordable form conveying insurable title to the Land and Improvements, subject only to Permitted Exceptions, duly executed and acknowledged by Seller." The existing $25,000,000 mortgage, although listed as an exception in the title report, was not a

Permitted Exception under the agreement. Thus, section 4.2 (a) required Donerail to deliver "insurable title" with no exception made for the existing mortgage.[5]

Prior to the closing date, Donerail coordinated with Fidelity to be certain that Fidelity would insure title in compliance with section 4.2 (a). At the closing, 405 Park was informed that Fidelity was prepared to issue a title insurance policy without exception for the mortgage. Kristin Bellouny, Senior Underwriting Counsel for Fidelity, testified at her deposition that she was responsible for preparing the title for closing, and was authorized to decide whether any exceptions in the title report should be omitted. She confirmed that Fidelity was prepared to issue title insurance at the closing without exception for the existing mortgage based on Donerail's payment for the defeasance securities on the first day of the two-day defeasance process. This evidence is sufficient to establish that Donerail was ready, willing and able to perform its obligations under section 4.2 (a).[6]

In seeking to excuse its nonperformance, 405 Park contends that Donerail failed to comply with section 2.2 of the agreement. That section provides, in relevant part: "[Donerail] shall, on or prior to the Closing, pay, discharge or remove of record or cause to be paid, discharged or removed of record, at Seller's sole cost and expense, (a) all mortgages . . . encumbering the Property (other than the Permitted Exceptions) . . . ." Since the existing mortgage was not a Permitted Exception, and because the mortgage loan was not prepayable, 405 Park argues that this provision requires that the mortgage lien be actually discharged, and that a satisfaction of mortgage be delivered at closing, before 405 Park was obliged to remit the remainder of the purchase price. Donerail's position is that it fully complied with section 2.2 because, at the closing, it was prepared to, and in fact offered to, pay for the defeasance securities which would

---

**5.** An exception to title is a matter for which the title company will not provide insurance.

**6.** 405 Park argues that there is no evidence in the record that its own title insurance company, Royal Abstract, was willing to issue the required title insurance. However, the agreement only requires "insurable title," and does not specify any particular company. Moreover, section 2.1 of the agreement designates Fidelity as "the 'Title Company,'" and 405 Park makes no claim that Fidelity is not a reputable insurer.

have entitled Donerail to a discharge and satisfaction of the mortgage.[7]

■ Contrary to 405 Park's contention, section 2.2 does not require that Donerail provide 405 Park with a mortgage satisfaction at or before closing. Indeed, the language does not even mention a mortgage satisfaction. Nor does the provision require Donerail to actually discharge the mortgage. Instead, all that is required is that Donerail "pay, discharge *or* remove of record . . . [the existing] mortgage[ ]" (emphasis added).

We conclude that, in the context of this nonprepayable defeasible mortgage, the phrase "pay . . . [the] mortgage[ ]," means to pay for the defeasment securities which would entitle Donerail to a discharge and satisfaction of the mortgage. 405 Park unconvincingly argues that one cannot "pay" a "mortgage," but can only "pay" a "mortgage loan." To begin, section 2.2 does not contain the phrase "mortgage loan," but instead allows Donerail to "pay . . . [the] mortgage[ ]." Furthermore, paying a mortgage loan and paying for the defeasment securities here are functionally equivalent—both result in removal of the mortgage lien. Thus, we agree with the motion court that "pay-[ing] . . . [the] mortgage[ ]," as that phrase is used in section 2.2, means satisfying the conditions that entitle the borrower to a discharge.

This construction makes perfect sense in the context of real estate closings where the property is encumbered by a mortgage. In the typical case, the mortgage is paid off on the day of closing contemporaneously with the remittal of the balance of the purchase price. Of course, no rational seller would pay off a mortgage in advance of the closing, because if the closing failed to occur, the seller would have lost the mortgage loan. This is precisely the situation here. As noted above, Donerail's mortgage loan contained very favorable terms and had an attractive interest rate. If Donerail paid for the defeasance securities and completed the defeasance process before the closing and 405 Park subsequently refused to close, Donerail would have lost its valuable loan.

405 Park complains that it had no guarantee that the defeasance process would be successfully completed the day after closing, and lists a parade of horribles it might have suffered in the ensuing 24 hours, including that Fidelity "could go cor-

---

7. Because section 2.2 refers to "all mortgages," we reject Donerail's argument that it is limited to new objections to title.

rupt," or that its offices "would burn down."[8] 405 Park's alleged concerns were not reasonable, and appear to be pretextual, particularly in light of its expressed desire not to close. In truth, had 405 Park proceeded with the closing upon payment for the defeasance securities, it would have suffered no real prejudice. 405 Park was protected in two substantial ways. First, Fidelity had committed to insure title without exception for the mortgage. More importantly, Donerail offered to allow 405 Park to retain twice the amount of the mortgage—$50 million—from the purchase price until the defeasment process was complete, an offer 405 Park rejected. If 405 Park had legitimate concerns that the mortgage would not be successfully defeased, holding back $50 million from a $178,500,000 purchase price would have satisfied those concerns.[9]

In sum, Donerail demonstrated that it was ready, willing and able to close, and that 405 Park defaulted by refusing to remit the remainder of the purchase price without lawful excuse. As a result of 405 Park's breach, section 6.1 of the agreement entitled Donerail to terminate the contract and retain the earnest money deposit as liquidated damages. Additionally, pursuant to section 2 (d) of the amendment, 405 Park is liable to Donerail for the Pre-Effective Date interest it previously received.

We have considered 405 Park's remaining contentions, and find them unavailing.

Accordingly, the order of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered February 8, 2011, which, to the extent appealed from as limited by the briefs, denied 405 Park LLC's motion for summary judgment on its first cause of action for breach of contract and fourth cause of action for foreclosure of a common law contract vendee's lien, should be affirmed, without costs. The order of the same court and Justice, entered September 27, 2011, which, to the extent appealed from as limited by the briefs, denied 405 Park's motion for leave to renew its motion for summary judgment, denied 405 Park's motion to compel discovery, granted Donerail Corporation N.V.'s motion for leave to renew its cross motion for summary judgment, and upon renewal, granted Donerail's cross motion for summary judgment on its first cause of action

---

8. 405 Park's counsel made these statements at the October 14, 2010 oral argument on the summary judgment motions.

9. 405 Park's reliance on section 1.2 of the agreement is misplaced. Unlike section 4.2, which sets forth what Donerail was required to tender at closing, section 1.2 does not contain any closing obligations.

for breach of contract and its cross motion for summary judgment dismissing 405 Park's complaint, should be affirmed, without costs.

MAZZARELLI, J.P., FRIEDMAN, CATTERSON and MANZANET-DANIELS, JJ., concur.

Order, Supreme Court, New York County, entered February 8, 2011, affirmed, without costs. Order, same court and justice, entered September 27, 2011, affirmed, without costs.